

# In the
# Missouri Court of Appeals
## Western District

| | |
|---|---|
| **IN THE INTEREST OF:  J.A.F. AND J.J.A.F.** | **WD81963** |
| **JUVENILE OFFICER,** | **OPINION FILED:** MARCH 5, 2019 |
| **Respondent,** | |
| **v.** | |
| **J.A.F.,** | |
| **Appellant.** | |

### Appeal from the Circuit Court of Jackson County, Missouri
### The Honorable J. Dale Youngs, Judge

### Before Division Three: Mark D. Pfeiffer, Presiding Judge, Lisa White Hardwick, Judge, Anthony Rex Gabbert, Judge

J.F. ("Father") appeals the circuit court's judgment terminating his parental rights to two biological children, J.A.F. and J.J.A.F.  Father contends the circuit court 1) erred in terminating parental rights pursuant to Section 211.447.5(2)[1] because there was no clear, cogent, and convincing evidence that he murdered the children's mother in the presence of the children, 2) erred in terminating parental rights pursuant to Section 211.447.5(2) because there was no clear, cogent, and convincing evidence that he repeatedly and continuously failed to provide the children

---

[1] All statutory references are to the Revised Statutes of Missouri as supplemented through 2018, unless otherwise noted.

with adequate support, 3) erred in terminating parental rights pursuant to Section 211.447.5(6) because there was no clear, cogent, and convincing evidence that he is unfit to be a party to the parent-child relationship, and 4) abused its discretion in finding termination of parental rights to be in the best interests of the children because the court's findings were not supported by substantial evidence. We affirm.

## Factual Background and Procedural Background

On August 11, 2017, the Juvenile Officer filed a petition alleging J.A.F., age nine, and J.J.A.F., age seven, were without proper care, custody, and support and subject to the jurisdiction of the court pursuant to Section 211.031.1. The Juvenile Officer alleged Father neglected the children by being violent and aggressive and subjected the children to domestic violence towards their mother ("Mother"). Further, on August 2, 2017, while the children were present in Father's home, Father shot and killed Mother. Father was incarcerated on pending charges of second degree murder and armed criminal action. The Juvenile Officer alleged that Father had not addressed his exposure of the children to domestic violence or his violent and aggressive behaviors; therefore, the safety of the children could not be ensured with Father. Further, Father's actions placed the children at risk of further harm or neglect absent court intervention. The Juvenile Officer alleged that a maternal relative was physically caring for the children, but had no legal authority to enroll the children in school or provide for their medical needs.

Simultaneously with the filing of the Petition, the Juvenile Officer applied to the court for an order of temporary protective custody pursuant to Rule 123.04. A temporary order was entered on August 11, 2017, placing the children in the custody of the Missouri Department of Social Services, Children's Division. A protective custody hearing was held August 15, 2017, at which time the children were ordered placed in the Children's Division's custody for appropriate

2

placement. It was ordered the children have no contact with Father or paternal relatives. The Children's Division was ordered to provide the children individual therapy focusing on grief and trauma, and provide a psychological evaluation and parenting assessment for Father.

On December 11, 2017, the court heard evidence on the Juvenile Officer's petition as well as recommendations regarding disposition. Father was represented by counsel. On December 20, 2017, the court entered its Judgment finding the petition's allegations proven by clear and convincing evidence and incorporating those allegations as findings of the court. The court further found:

> The father has committed a severe act of emotional abuse toward the children and another child in the family under circumstances that indicate that the parent knew or should have known that such acts were being committed toward the children and another child in the family, including killing the mother with a firearm while the children were present at the residence where the shooting occurred. Therefore, the court finds that termination of parental rights and adoption is the appropriate permanency plan. This permanency plan is in the best interest of the children.

Father did not appeal the court's Judgment.

On January 29, 2018, the Juvenile Officer filed petitions to terminate Father's parental rights to J.A.F. and J.J.A.F. Trial was held May 7, 2018. Father was represented by counsel and appeared in person (in the custody of the Jackson County Department of Corrections). Evidence at trial, in the light most favorable to the court's Judgment, was as follows:

On August 2, 2017, Officer Michael Crooks and Officer Jonathan Hall were dispatched on a sound of shots call, which was upgraded to a shooting. Homicide Detective Bonita Cannon was also dispatched to the scene. Upon arriving at the scene, officers approached the residence from the west side and then moved to the north. They heard the north door slam closed as if someone had just run inside. Officers observed a female face down at the bottom of the stairs leading to the

3

home's front porch, approximately fifteen feet from the north door of the home. She had no pulse. A Cobra 380 handgun, registered to Father, was lying near her body. She had a set of keys in her left hand, and a cell phone was lying a few feet from her body. Glass was broken out of the screen door. Police found a note written by Mother to Father. The note asked for the children back. It stated that the children needed to get ready for school, meet their teachers, and get school supplies. It also stated that Mother knew the children missed her.

Officers called for individuals within the home to exit with hands up; Father exited the home and was handcuffed and taken into custody. Officers testified that Father showed no signs of distress. When asked, Father advised that there were children in the home and a gun (9 mm handgun registered to Father) in the kitchen. Once inside the home, officers found J.A.F., J.J.A.F., and two other children locked in a bedroom. (At least one of these children was Father's from a different mother.) The oldest child opened the door holding a small baseball bat. The children were scared and distraught. Officer Crooks remained with them until family arrived.

Video surveillance equipment was found unplugged in the master bedroom closet. Retrieved video footage from the time period of the shooting showed Father walking, and just before the video ended it showed Mother standing outside Father's door with her cell phone in one hand and keys in the other. Father had a firearm in his hand. The video went black moments before the officers' call for service was received. Ammunition for both the Cobra 380 handgun and 9 mm handgun was found in a plastic plant mounted to the wall in the master bedroom, and also in a bedside table. Spent shell casings from a 9 mm gun were found near the door and on the porch.

A.R. (Mother's sister/children's maternal aunt) was on the phone with Mother while Mother was at Father's residence. A.R. had known Father since 2005 or 2006 when Mother and

4

Father started dating. After J.A.F. and J.J.A.F. were born, A.R. saw the children nearly every weekend. The boys would often spend the night at A.R.'s home. A.R. was aware of "domestic issues" between Mother and Father. A.R. testified that Father threatened Mother "millions of times" and would say things and send text messages such as, "this is your time to die today." A.R. testified that Father had pulled Mother's hair in the past, and when the couple was in the process of separating, Father choked Mother. In 2015, when the couple first separated, Father took J.A.F. and J.J.A.F. for approximately three weeks allowing no contact with Mother.

In May of 2017, Father took the children at the close of the school year and allowed no contact with Mother. During that time, Father threatened Mother via text messages. A.R. testified that the couple's divorce decree awarded joint custody, with Father receiving parenting time "every two weeks or so." Mother went to the police for assistance retrieving the children, but was told they could do nothing to help her. A.R. testified that at some point prior to August 2, 2017, Mother "filed for full custody."

Mother went to Father's home on August 2, 2017, to get the children. A.R. spoke to Mother at approximately 2:30 that afternoon and talked for approximately twenty minutes. A.R. testified that Mother was at Father's home "trying to get the kids." A.R. heard Mother say to Father, "Are you going to put a gun out on me?" A.R. asked Mother, "Is that [Father] and do you want me to call the police?" Mother said "no" and hung up. A.R. called Mother back. Mother was "distraught, just trying to get her kids back." The conversation lasted about thirty seconds. A.R. went to Father's home later that day and saw police crime tape; she went to the police station that night. J.A.F. and J.J.A.F. were placed in A.R.'s care and remained in her care at the time of the termination hearing.

Ransom Ellis, a Forensic Pathology Fellow at the Jackson County Medical Examiner's Office, performed an autopsy on Mother on August 3, 2017. Ellis found seven gunshot entry wounds to Mother's body, and five exit wounds. Ellis determined the shots entered, 1) Mother's left upper back, 2) Mother's right upper back, 3) the "right upper lateral" of Mother's back 4) the back of Mother's right upper arm near the shoulder, 5) the back of Mother's right upper arm just below the other shot near the shoulder, 6) the front of Mother's right wrist at the base of the right thumb, and 7) Mother's right hand between the second and third fingers. The gun was at least three feet from Mother when she was shot. Mother had additional trivial contusions and abrasions consistent with falling face down onto a hard surface or gravel. A toxicology report was performed on Mother. Her blood was negative for illicit substances and alcohol, and was positive for caffeine and Benadryl. Ellis determined the cause of Mother's death to be multiple gunshot wounds, and the manner of Mother's death homicide. Suicide was ruled out due to the number of gunshot wounds, Mother having been shot in the back, and no close range evidence of soot, stippling, or muzzle imprint.

Children's Division investigator Tara Parrish spoke with J.A.F. and J.J.A.F. at the police station the day of the shooting, and also the following day at A.R.'s home. Both of the children also participated in forensic interviews at the Child Protection Center on August 4, 2017. The children reported that, the day Mother was killed, they heard Mother knocking on the door and calling their names. They reported it had been several months since they had seen her. J.A.F. said the last time he saw Mother was field day at school; he also said Father would not let him see Mother. When they first heard Mother knocking on the door, Father was not home; he had left to deliver some brownies. J.A.F. and J.J.A.F. were in the home with two other children. When

Mother was knocking outside, one of the other children telephoned her own mother. The two other children then told J.A.F. and J.J.A.F. to go into a bedroom.

Upon returning home, Father looked in on the children in the bedroom. J.A.F. reported hearing Father and Mother yelling and screaming. He heard a whipping sound, as if his father was whipping something. Law enforcement arrived shortly thereafter. He stated that Father had a gun at the home when they were there, and would carry it with him in the car when he left. J.A.F. reported that Father and Mother previously fought a lot. Father would use his hands to fight with Mother and at one point chased Mother around the house with a knife trying to stab her. Father would discipline J.A.F. with whippings with the metal side of a belt and would hit him in the chest with a closed fist.

J.J.A.F. gave a similar account. He reported that on the day of August 2, 2017, after he heard yelling and screaming between his parents, he heard banging noises. He also heard his mother scream. He stated that his parents previously fought a lot, and that Father would hit Mother, pull her hair, and choke her. He once observed Father point a gun at Mother's head. Like J.A.F., J.J.A.F. reported that father kept a gun within the home and upon leaving would put it on his lap while driving in the car. The children denied ever seeing Mother with a gun.

Both children started therapy with Claire Jones in October 2017. Both children were diagnosed with Post Traumatic Stress Disorder (PTSD). Jones testified that J.A.F. had been able to tolerate only minimal discussion regarding the incident involving Mother. Jones testified J.A.F. "point blank" said, "My father killed my mother." His PTSD diagnosis stems from "exposure to trauma, maladaptive coping and avoidance to a lot of different things that surround the event, thinks that he is to blame and anger, irritability, extreme mood dysregulation." J.J.A.F. coped by

avoiding discussion of the events. He showed ambivalence toward Father and tensed up when Jones attempted to discuss Father.

Jones testified that Father sent inappropriate letters to the children after the incident. She testified that the letters show no compassion or empathy for the children's situation. Father makes statements in the letters about coming home to get the children, which Jones believes the children would consider threatening. Jones also considers manipulative a letter Father sent to the boys mentioning that Father knew the children's family was telling them a lot of things, and that the family wanted the children to say things about Father to other people. The letter told them not to lie for anyone. Jones recommended the children have no contact with Father. She testified that reuniting the children with Father posed a risk to the children's emotional and psychological well-being. She testified that if Father's rights were not terminated and Father was to get out of jail, reunification was "unforeseeable" and would depend on a lot of different factors. If even possible, it would take a minimum of three to five years to accomplish.

Melanie Hicks, supervisor at the Children's Division, testified that Father was mailed incarcerated parent letters in August and September 2017. Monthly letters were sent thereafter and attempts to visit or call Father at the jail were unsuccessful. Father sent no correspondence in response to the incarcerated parent letters. Father had not asked Hicks how the children were doing, and provided no financial support for the children. At the end of February, 2018, Father sent a packet of letters and cards for the children.

Kimberly Markward, Children's Division case worker for the children from August 2017 to January 2018, also testified. She stated that the only correspondence she received from Father was just before she left the case. Father wanted to know why the children were not placed with his mother. He did not ask about the children's well-being. Markward testified that both children

8

referenced Father as "John" and expressed fear of Father. J.A.F. told her he did not feel safe going home with Father.

The Juvenile Officer called Father to testify and Father invoked his 5th Amendment right to remain silent. The Juvenile Officer made a record of the questions he intended to ask Father, and requested the court draw adverse Fifth Amendment inferences regarding those questions.

On July 5, 2018, the circuit court entered its Judgment terminating Father's parental rights to J.A.F. and J.J.A.F. This appeal follows.

## Standard of Review

Termination of parental rights is permitted when a statutory ground for termination is supported by clear, cogent, and convincing evidence and when termination is determined to be in the best interests of the child by a preponderance of the evidence. *In re A.M.S.*, 272 S.W.3d 305, 308 (Mo. App. 2008). "When the trial court finds multiple statutory grounds for termination of parental rights, in order to affirm the judgment this Court need only find that one of the statutory bases was proven and that termination was in the best interests of the child." *In Re T.R.W.*, 317 S.W.3d 167, 170 (Mo. App. 2010). In our review, we "defer to the [circuit] court's ability to judge the credibility of witnesses and will affirm the judgment unless there is no substantial evidence to support it, it is contrary to the evidence, or it erroneously declares or applies the law." *Interest of K.A.W. and K.A.W.*, 133 S.W.3d 1, 11 (Mo. banc 2004). Conflicting evidence is reviewed in the light most favorable to the circuit court's judgment. *J.A.R. v. D.G.R.*, 426 S.W.3d 624, 626 (Mo. banc 2014).

## Point I – Section 211.447.5(2)

In Father's first point on appeal, he contends the circuit court erred in terminating his parental rights on grounds that he committed a severe act of emotional abuse under Section

211.447.5(2) because clear, cogent, and convincing evidence did not support the court's finding that Father murdered Mother in the presence of the children.

Under Section 211.447.5(2), parental rights may be terminated where "the child has been abused or neglected." In determining whether to terminate parental rights pursuant to Section 211.447.5(2), the court shall consider and make findings on the following conditions or acts of the parent:

> (a) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;

> (b) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control of the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control;

> (c) A severe act or recurrent acts of physical, emotional or sexual abuse toward the child or any child in the family by the parent, including an act of incest, or by another under circumstances that indicate that the parent knew or should have known that such acts were being committed toward the child or any child in the family; or

> (d) Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development.

The clear, cogent, and convincing evidence standard applies to the ground for termination, not factors (a) through (d). *T.T.G. v. K.S.G.*, 530 S.W.3d 489, 495 (Mo. banc 2017). "Factors (a) though (d) are simply categories of evidence to be considered along with other relevant evidence, rather than separate grounds for termination in and of themselves." *Id.* (internal quotation marks and citations omitted).

Here, the court terminated Father's parental rights to the children under Section 211.447.5(2) finding clear, cogent, and convincing evidence that the children were neglected when Father subjected the children to domestic violence and shot and killed Mother while the children were present in his home. The court made extensive findings in consideration of statutory factor (c) and discussed trial evidence supporting that factor. The court stated, in part:

> [F]ather committed a severe act or recurrent acts of abuse against the children or a child in the family, or [F]ather knew or should have known that acts of physical, emotional or sexual abuse towards the children or another child in the family were being committed.

> The Court finds that the father murdered the children's mother in their presence. The evidence showed that in late May 2017, the father violated the parents' court-ordered visitation plan by taking custody of the children full-time and preventing the mother from seeing them or even contacting them. In response, the mother filed legal action seeking to gain full custody. During this time, the father threatened the mother's life.

Father argues that the court erred in concluding Father committed a severe act of emotional abuse because the court failed to consider the totality of the evidence, including that Mother came onto Father's property in an attempt to remove the children from Father's custody, Father has not admitted to killing Mother, and Father still awaits trial on charges associated with her death. Father argues that he took substantial steps to protect the children "including having them go to an interior bedroom and lock the door."[2] He states that he checked on the children upon arriving home and immediately informed police of the children's whereabouts. Father argues the evidence does not support that Mother was killed in the children's presence; the evidence shows the children were not aware she had been shot and never saw her dead body.

---

[2] There was no evidence Father had the children go to an interior bedroom. The evidence was that one of the older children called her own mother while Mother was knocking on Father's door; thereafter, the two older children told J.A.F. and J.J.A.F. to go to an interior bedroom.

We first note that our Supreme court in *In re Adoption of C.M.B.R.*, 332 S.W.3d 793 (Mo. banc 2011)[3] "laid to rest any argument that the 'clear, cogent, and convincing' burden of proof requires this Court to consider any contrary evidence when reviewing whether the judgment is supported by substantial evidence." *J.A.R.*, 426 S.W.3d at 626 n.4. Father asks us to reweigh the evidence and/or draw inferences in the light least favorable to the court's judgment; he fails to address how the evidence relied upon by the court does not support the court's judgment.

Regardless, the fact that Father has not been convicted on charges related to Mother's death is of no consequence. Even acquittal on charges wherein conviction requires proof beyond a reasonable doubt would not preclude the existence of clear, cogent, and convincing evidence that Father killed Mother while the children were present in Father's home. Further, although the court stated under its statutory factor (c) analysis that "father murdered the children's mother *in their presence*," the court found by clear, cogent, and convincing evidence that the children were neglected by Father when he shot and killed Mother "while the children were present in the home." This is supported by substantial evidence. It was not necessary for the children to witness Mother die, or see her dead body, in order to have suffered severe emotional trauma resulting from Father's actions. The children heard Mother full of life, knocking on Father's door and calling their names. They never saw Mother, however, as they were told to lock themselves in a bedroom. After Father arrived home, he made his presence known. He checked on them in the locked bedroom. The children then heard arguing and yelling, and they heard Mother scream. They heard bangs and whipping sounds. J.A.F. attributed the whipping sounds to something Father was doing. The children were visibly distraught and scared when police arrived.

---

[3] Overruled on other grounds.

The children know their mother was killed that day, and have articulated personal beliefs that Father is responsible. Such beliefs are reasonable given what the children heard that day, and that they previously witnessed Father pull Mother's hair, choke her, attempt to stab her with a knife, and put a gun to her head. The children know Mother was seeking them the day she died. J.A.F. blames himself for Mother's death and believes he should have protected her. He feels guilt over her death. J.J.A.F. says he misses Mother and wishes she was there. Both children suffer from PTSD stemming from Mother's death and Father's involvement in that death.

We find substantial evidence within the record to support the court's conclusion that there was clear and convincing evidence, pursuant to Section 211.447.5(2), that Father neglected the children and committed a severe act of emotional abuse justifying termination of Father's parental rights.[4] Point I is denied.[5]

### Point IV – Children's Best Interest

In Father's fourth point on appeal, he contends the circuit court erred in concluding termination of parental rights was in the children's best interests.[6]

---

[4] Moreover, Father really has no grounds to dispute that he committed a severe act of emotional abuse toward the children by killing Mother while the children were present at his residence. This conclusion, under a clear and convincing evidence standard, was reached in the court's December 20, 2017, adjudication Judgment involving the same set of facts and evidence. The court took judicial notice of and incorporated the adjudication Judgment into the termination Judgment. Father did not appeal the December 20, 2017, Judgment and, therefore, the conclusiveness of the issues decided therein are final. *See Interest of K.R.T.*, 505 S.W.3d 864, 868 (Mo. App. 2016). To the extent we need not consider this claim on appeal, we do so *ex gratia*.

[5] As proof of one statutory ground is sufficient to support termination of parental rights, we need not address Father's contentions that the court erred in its analysis of other statutory grounds under Section 211.447.5(2), or in concluding Father was unfit to be party to the parent/child relationship under Section 211.447.5(6).

[6] Father states in his point relied on that substantial evidence did not support the court's findings regarding the likelihood of additional services to bring about lasting parental adjustment, or Father's propensity to adjust his violent behaviors in order to safely parent the children. Father does not address these claims in the body of his brief. "We deem points not developed in the argument section to be abandoned." *Mortg. Elec. Regis. Sys., Inc. v. Williams-Pelton*, 196 S.W.3d 50, 52 (Mo. App. 2005).

13

After this Court determines that one or more statutory ground has been proven by clear, convincing, and cogent evidence, this Court must ask whether termination of parental rights was in the best interest of the child. At the trial level, the standard of proof for this best interest inquiry is a preponderance of the evidence; on appeal, the standard of review is abuse of discretion.

*J.A.R.*, 426 S.W.3d at 626 (internal citations and quotation marks omitted). An abuse of discretion occurs only when the trial court's ruling is clearly against the logic of the circumstances and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration. *In Interest of J.P.B.*, 509 S.W.3d 84, 96 (Mo. banc 2017).

Here, the court considered the factors set forth in Section 211.447.7 in reaching its ultimate conclusion that a preponderance of the evidence showed termination of parental rights to be in the children's best interest. The court made the following findings:

a. The children do not have any emotional ties to the father. Since the death of their mother at the hands of their father, they refer to him only as 'John.' They do not request visits with him. They have both been traumatized by the events surrounding their mother's death and suffer from PTSD.

b. Since the children were brought into custody of Children's Division, the father has not attempted to maintain regular visitation with the children. Both Kimberly Markward, the former case worker who the Court found credible, and Ms. Hicks testified that the father made very little effort to reach out to them and that he never requested visitation with the children. Further, he never made an effort to modify the contact restriction in the underlying case.

c. The father has provided no support for the cost or care and maintenance of the children. Once again, the evidence was clear that the father provided [the] children with no tokens of affection – gifts, clothes, money – since August 2017.

d. Additional services would not be likely to bring about lasting parental adjustment enabling a return of the children to the father within an ascertainable period of time. While the father has made very little effort to involve himself with underlying child abuse and neglect case, even assuming he began participating in services, reunification in the next six months would be extremely unlikely. As set forth above, both children suffer from PTSD as a result of the events surrounding their mother's death. [J.A.F.] says his father killed his mother, and is fearful of anyone he does not know. He blames himself

14

for this mother's death because he could not protect her from the father. No one who testified believed it would be anything but harmful for the children to even have contact with their father, much less be reunified with him. Both Ms. Hicks and Ms. Jones testified that it was unrealistic to believe the father could reunify with the children in the reasonably foreseeable future. Both recommended termination of his parental rights.

e. The father has demonstrated his disinterest in and lack of commitment to the children by refusing to meaningfully cooperate in any court-ordered programs meant to aid in their reunification with the child. Here again, the father did not stay in contact with either Ms. Markward [or] Ms. Hicks.

f. The father is currently incarcerated.

g. There was substantial evidence presented that the father committed deliberate acts which subjected the children to a substantial risk of physical or mental harm. Specifically, the father murdered the mother while the children were present at the residence.

The court concluded that the children were in need of, and deserved, a stable and permanent home.

In contending termination of parental rights was not in the children's best interest, Father argues that he is incarcerated and awaiting trial on charges he killed Mother; he has not been convicted and has had no opportunity to defend the allegations. He contends that, while incarcerated, he has maintained a relationship with another child, whom he has with a different mother, and has repeatedly attempted to write to J.A.F. and J.J.A.F. He maintains he has not committed a severe act of emotional abuse against the children, and has not failed to provide for their care.

We find that, while disputing the court's conclusions, Father fails to show how a preponderance of the evidence did not support the court's findings. Father ignores the court's findings regarding the emotional impact Mother's death, and the surrounding circumstances, had on the children. Although he argues he sent letters to the children, he does not address the court's articulated concerns that Father's letters show no empathy for the children, warn the children that

Mother's family is coaching them, and discuss seeing the children soon.  Father's argument that he continues to have contact with a child from another mother, a mother he is not alleged to have killed, is irrelevant to the best interests of J.A.F. and J.J.A.F.

Moreover, the Juvenile Officer presented substantial evidence that termination of Father's parental rights was in the children's best interest; the court's best interest findings are based on this evidence.  Father had the opportunity to present evidence regarding all aspects of the termination of parental rights case, including the children's best interests; Father was not deprived of an opportunity to defend any of the allegations.  Father offered only one exhibit -- a letter from the mother of one of his other children.

We find no abuse of discretion in the court's conclusion that a preponderance of the trial evidence showed termination of Father's parental rights to be in the children's best interests. Father's fourth point on appeal is denied.

### Conclusion

We conclude that substantial evidence supports the court's Judgment, pursuant to Section 211.447.5(2), that Father neglected the children and committed a severe act of emotional abuse toward the children by killing Mother while the children were present at his residence.  Further, substantial evidence supports the court's conclusion that termination of Father's parental rights is in the best interest of the children.

We affirm the circuit court's judgment.

_____
Anthony Rex Gabbert, Judge

All concur.

16