

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| IN THE INTEREST OF:  A.M.R., R.H.H. III, and H.H. | ) ) ) | |
| JUVENILE OFFICER and GUARDIAN AD LITEM, | ) ) ) | **WD85850** **(Consolidated with WD85858)** |
| Appellants, | ) ) | |
| v. | ) ) | **OPINION FILED:** **August 15, 2023** |
| J.M., | ) ) ) | |
| Respondent. | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
**The Honorable Kevin D. Harrell, Judge**

**Before Division Three:**  Alok Ahuja, Presiding Judge, and
Karen King Mitchell and Edward R. Ardini, Jr., Judges

The Juvenile Officer (J.O.)[1] appeals the trial court's denial of her petition to

terminate the parental rights of J.M. (Mother).  J.O. raises five points on appeal.  In her

first four points, she asserts the trial court erred in denying the petition because it was

---

[1] The Guardian Ad Litem (G.A.L.) also appeals, and the court consolidated the appeals.  J.O. and G.A.L. filed joint opening and reply briefs.  For ease of reference, we refer to J.O. and G.A.L. collectively as J.O., noting G.A.L. separately, where necessary, for clarity.

supported by substantial evidence (Point I) and denial of the petition was against the weight of the evidence (Point II), based on misapplication of the law (Point III), and relied on inadmissible evidence and misinterpretation of admissible evidence (Point IV). For her final point, J.O. argues the trial court erred in finding termination was not in the children's best interest (Point V). Finding no error, we affirm.

## Background[2]

Mother has three children: A.M.R. (Eldest Child), whose birth father is not a party to this litigation, R.H.H. III (Middle Child), and H.H. (Youngest Child), who are the product of Mother's relationship with R.H. Jr. (Father).[3] On October 26, 2020, J.O. filed petitions alleging abuse and neglect and seeking protective custody of the two older children based on allegations that Middle Child had sustained injuries from non-accidental trauma. Following a hearing, the court placed those two children in the custody of the Children's Division for appropriate placement to include Parents so long as the maternal grandmother (Grandmother) resided in the home and all parental contact with the children was supervised. Early the following year, Youngest Child was born; she was allowed to remain in Parents' custody under Children's Division supervision.

On April 7, 2021, J.O. filed motions to modify the abuse/neglect petitions, alleging additional physical abuse of Middle Child and Youngest Child. Two days later, the court ordered the children to remain in the care and custody of Children's Division

---

[2] "We view the facts and all reasonable inferences therefrom in the light most favorable to the trial court's judgment . . . ." *In re C.S.*, 351 S.W.3d 264, 265 n.2 (Mo. App. W.D. 2011).

[3] We refer to Mother and Father collectively as Parents.

for appropriate licensed placement, with supervised visitation granted to Parents. J.O. then filed first amended motions to modify and petitions to terminate Parents' parental rights. The court consolidated the first amended motions to modify and the termination petitions.

On March 28 and 29, 2022, a bench trial was held,[4] and the following testimony was offered. On September 2, 2020, Mother asked her grandmother (Great-Grandmother) to take Middle Child, who was then six months old, to his physician because Mother was concerned that Middle Child was not moving his left arm normally. The physician did not detect any trauma to the arm. Mother wanted a second opinion, so she took Middle Child to the emergency room on September 6, 2020. X-rays revealed three fractures in his arm—one each to his radius and ulna and one to his humerus. The radius and ulna fractures showed signs of healing, indicating that they had occurred at least seven-to-ten days prior to the x-rays. The humerus fracture was acute, meaning it showed no signs of healing and, thus, was more recent.

A child abuse pediatrician who examined Middle Child on September 18, 2020, concluded that he had suffered two separate arm injuries. She further testified that the types of injuries exhibited do not typically occur by accident, especially where, as here, Middle Child was not yet sitting independently or crawling. And there was no specific history of trauma that would indicate his injuries occurred accidentally. Mother reported

---

[4] On the second day of trial, Father submitted written consents to terminate his parental rights to Middle Child and Youngest Child. In offering Father's consents to the court, Father's counsel stated that Father "takes full responsibility for all the injuries." A judgment terminating Father's parental rights was entered on August 31, 2022.

that Middle Child had fallen off the family's couch, but the pediatrician testified that such a fall would not explain all three fractures. She diagnosed Middle Child with physical abuse and expressed concern for him if he were returned to the same caregivers.

A Grandview police detective interviewed Mother and Father. Mother reported that Middle Child had fallen off the couch but had been easily soothed; Mother also mentioned that Middle Child's arm had gotten stuck in the slats of his crib. Mother indicated that Middle Child was in her care all the time, that Father would be around sometimes but was never alone with Middle Child, and that neither Mother nor Father ever expressed anger toward Middle Child. According to the detective, Mother was cooperative throughout the interview. Father told the detective that neither parent ever lost patience with Middle Child, and Father denied hurting Middle Child. Father said that Middle Child was with Mother most of the time but would occasionally be left with other family members. The detective expressed concern for Middle Child if he were returned to Parents' care.

Grandmother testified that, from October 2020 to April 2021, she, her husband, and sixteen-year-old son, lived with Mother, Father, and the children. Grandmother never saw Mother or Father get angry with the children or harm them. Great-Grandmother testified that Mother was the primary caregiver, but Father would watch the children while Mother bathed or cooked dinner; Father also liked to put the children to bed. Great-Grandmother never had concerns about how Mother treated the children, describing Mother as "a perfect mother with the kids."

On April 5, 2021, Grandmother went grocery shopping with Mother, Eldest Child, and Middle Child, while Youngest Child, who was approximately nine-and-a-half-weeks old at the time, stayed with Great-Grandmother. When Mother and Grandmother picked Youngest Child up from Great-Grandmother's house, Youngest Child was acting normally.[5] When they returned home, Mother gave Youngest Child a bottle and Father put her down for a nap; Father later told Grandmother that he accidentally hit Youngest Child's head on the dresser or crib as he was putting her down. Mother went to check on Youngest Child a few minutes later and found her unresponsive and experiencing an apparent seizure; Mother called 911.

A child abuse pediatrics fellow testified that, on April 5, 2021, Youngest Child arrived at the hospital with life-threatening injuries. She was having difficulty breathing and had to be intubated; she also displayed seizure-like activity and an altered mental state. X-rays showed four healing rib fractures and one acute rib fracture, indicating at least two episodes of trauma to her ribs; no medical explanation for the fractures was provided.

A CT scan of Youngest Child's head revealed multiple bilateral subdural hemorrhages and multiple skull fractures, including a V-shaped left parietal bone fracture, right parietal bone fracture with associated scalp swelling, and a left occipital bone fracture. None of the explanations offered by the family explained the extent and

---

[5] At some point, Great-Grandmother said that she had accidently bumped Youngest Child's head on a door frame, but that actually had occurred a week or so earlier, and Youngest Child had not shown any ill effects from that event.

severity of her head injuries. She was hospitalized for twenty-four days. She required three surgeries post-discharge and eventually had a permanent feeding tube inserted. A June 2021 MRI of her brain showed parts of her brain shrinking and dying off; she will require caregiver assistance for her lifetime.

As a result of the injuries to Youngest Child, a sibling exam was performed on Middle Child, who was then thirteen months old. X-rays showed five healing rib fractures that were not present when he was examined in September 2020; the new fractures were caused by blunt-force trauma. The pediatrics fellow testified that both Middle Child and Youngest Child may or may not have exhibited symptoms indicating rib injuries. The fellow expressed concern for the children's safety if they were returned to the same caregivers.

The children's foster care case manager testified that the Parents successfully completed an intensive in-home services program, and Mother remained engaged in services. The case manager also testified that Eldest Child reported Father "put[ing] his hands on her." She said Father had pulled her out of bed and punched her in the stomach several times. She did not indicate that Mother abused her. The case manager expressed concern about Mother's ability to protect the children from Father despite the fact that Parents were no longer in a relationship.

Mother testified that she did not know the cause of the injuries to Middle Child or Youngest Child; Mother had not witnessed anyone use force on them, and the children displayed no outward signs of abuse. Mother testified that, if she learned that someone was abusing her children, she would call the police. Eldest Child never told Mother

about Father's abuse.  And, if Mother is reunited with the children, she would live with them at Great-Grandmother's house.  When asked how she would protect her children, Mother testified that they would never see Father again.  Mother confirmed that her relationship with Father had ended and, at the time of the trial, she was staying in an apartment leased by Father, but he was never home when she was there.[6]  G.A.L. recommended termination of Mother's parental rights.

On September 6, 2022, the court issued findings of fact, conclusions of law, and judgment directing guardianship (September judgment).  Despite inconsistencies in the court's findings, the court "found sufficient evidence that there [we]re [statutory] grounds to terminate . . . [M]other's rights, . . . [but] that [termination] [wa]s not in the children's best interest . . . as the[y] . . . would benefit from a continued parent-child relationship" with Mother.  The court also found that appointment of Great-Grandmother as guardian for the children was in their best interest and directed Children's Division to expedite that process.

J.O. timely filed motions to amend the judgment, claiming, among other things, that the court made inconsistent findings as to whether a statutory ground for termination existed, failed to "make all statutorily required findings,"[7] and failed to directly appoint a guardian.

---

[6] Mother testified that she had nowhere else to live.  She could not live with Great-Grandmother because the children were there.  Grandmother could not provide a home for Mother.  Mother could not afford to rent an apartment by herself, and she made too much money to qualify for income-based assistance.

[7] "[T]o meet the standard of Rule 78.07 [After-Trial Motion—Allegations of Error Required], the allegations in the motion [to amend the judgment] must be sufficient to

On November 22, 2022, the court issued findings of fact, conclusions of law, and judgment directing guardianship for the children (November judgment), which does not mention the September judgment. The November judgment states, in part,

> The [J.O.] failed to demonstrate by clear and convincing evidence that [Mother] abused her children, knew about that abuse, or should have known about that abuse. This stems from inconsistent testimony by the J.O.'s witnesses, the role [Mother] played in immediately attempting to ascertain what caused injuries to her children, [Mother's] cooperation with law enforcement, and ultimately the revelation that [Father] was the perpetrator of the abuse.

The court also found, by a preponderance of the evidence, that termination of Mother's rights was not in the children's best interest. The November judgment also directed Children's Division to expedite appointment of Great-Grandmother as the children's guardian. J.O. did not file a motion to amend the November judgment, but instead appealed that judgment to this court.[8]

**Standard of Review**

"Termination of parental rights is permitted when a statutory ground for termination is supported by clear, cogent, and convincing evidence and when termination is determined to be in the best interests of the child by a preponderance of the evidence."

---

give the trial court an opportunity to correct its errors, without requiring the court to resort to aid [outside of] the motion." *Williams v. Williams*, 669 S.W.3d 708, 717 (Mo. App. E.D. 2023) (quoting *Brandt v. Csaki*, 937 S.W.2d 268, 275 (Mo. App. W.D. 1996)). A reference to "all statutorily required findings" is too vague to meet the standard of Rule 78.07 because the court would be left to search the record to determine which required findings it may have omitted. *Id.*

[8] Additional facts will be provided in the analysis, as necessary, to address J.O.'s claims.

*In re J.A.F.*, 570 S.W.3d 77, 82 (Mo. App. W.D. 2019). The party seeking termination bears the burden of proof. *In re T.M.P.*, 667 S.W.3d 124, 130 (Mo. App. E.D. 2022).

On appeal, we apply two different standards of review. First, as to the statutory grounds for terminating parental rights, we will affirm the trial court's judgment regarding whether there was clear, cogent, and convincing evidence to support a statutory ground for termination unless there is no substantial evidence to support it, it is contrary to the evidence, or it erroneously declares or applies the law. *In re R.D.M.*, 576 S.W.3d 318, 322 (Mo. App. E.D. 2019). "Evidence is clear, cogent and convincing when it instantly tilts the scales in favor of termination when weighed against opposing evidence and leaves the fact-finder with the abiding conviction that the evidence is true." *In re A.F.*, 543 S.W.3d 90, 96 (Mo. App. W.D. 2018) (quoting *In re K.M.A.-B.*, 493 S.W.3d 457, 467 (Mo. App. E.D. 2016)). The judgment will be reversed "only if we are left with the firm belief that the judgment is wrong." *In re R.D.M.*, 576 S.W.3d at 323 (quoting *In re S.Y.B.G.*, 443 S.W.3d 56, 59 (Mo. App. E.D. 2014)). We strictly construe the statute governing termination of parental rights in favor of preserving the parent-child relationship. *In re C.S.*, 351 S.W.3d 264, 267 (Mo. App. W.D. 2011). And "we defer to the circuit court's ability to judge the credibility of witnesses." *In re A.F.*, 543 S.W.3d at 96 (quoting *In re H.H.*, 525 S.W.3d 551, 556 (Mo. App. W.D. 2017)).

Second, as to the determination that termination is in the children's best interest, we "will reverse [that] determination . . . [only] when there is an abuse of discretion." *In re T.T.G.*, 530 S.W.3d 489, 493 (Mo. banc 2017). "An abuse of discretion occurs only when the trial court's ruling is clearly against the logic of the circumstances and is so

9

unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *In re J.A.F.*, 570 S.W.3d at 85.

## Analysis

J.O. raises five points on appeal. First, J.O. asserts the trial court erred in denying the petition because substantial evidence supported terminating Mother's parental rights under §§ 211.447.5(2)(c) and 211.447.5(5)(a).[9] Second, J.O. argues the court erred because denial of the petition was against the weight of the evidence. Third, J.O. claims the court erred because denial of the petition was based on misapplication of the law in that the court failed to make findings regarding the first amended motions to modify, misapplied § 211.447.5 and made inconsistent findings of fact and law, and misapplied § 211.477.4(3). Fourth, J.O. contends the court erred because, in denying the petition, the court relied on inadmissible evidence and erroneously interpreted admissible evidence. Finally, J.O. asserts the court abused its discretion in finding that termination of Mother's rights was not in the children's best interest.

### I. The record contained substantial evidence supporting denial of J.O.'s petition to terminate Mother's parental rights.

In Point I, J.O. argues the court erred in denying her petition because she met her burden of presenting substantial evidence that supported termination under §§ 211.447.5(2)(c) and 211.447.5(5)(a). In pertinent part, § 211.447.5 states,

---

[9] All statutory references are to the Revised Statutes of Missouri, Cum. Supp. 2020.

5. The juvenile officer or the division may file a petition to terminate the parental rights of the child's parent when it appears that one or more of the following grounds for termination exist:

. . .

(2) The child has been abused or neglected.  In determining whether to terminate parental rights pursuant to this subdivision, the court shall consider and make findings on the following conditions or acts of the parent:

. . .

(c) A severe act or recurrent acts of physical, emotional or sexual abuse toward the child or any child in the family by the parent, including an act of incest, or by another under circumstances that indicate that the parent knew or should have known that such acts were being committed toward the child or any child in the family;

. . .

(5)(a) The parent is unfit to be a party to the parent and child relationship because of a consistent pattern of committing a specific abuse including, but not limited to, specific conditions directly relating to the parent and child relationship which are determined by the court to be of a duration or nature that renders the parent unable for the reasonably foreseeable future to care appropriately for the ongoing physical, mental, or emotional needs of the child.

As J.O. emphasizes, the record contains evidence that Middle Child and Youngest Child suffered multiple instances of abuse and that, as the primary caregivers, Parents were unable to provide a medically credible explanation for the extent and severity of the injuries.  According to J.O., these factors "conclusively" established that "even if [Mother] did not cause the injuries, she knew who did."

But the record also contained evidence that Father was the likely abuser.  The Eldest Child reported that Father had punched her repeatedly.  Father was alone with the Youngest Child when she suffered head trauma.  And, after the children were removed

11

from Parents' care, Mother expressed concern that Father had caused their injuries, telling the children's foster care case manager, "we all have a good idea who did it." Mother also testified that she never used corporal punishment on the children or otherwise laid her hands on them.

As for whether Mother knew or should have known about the abuse, there was evidence that the Eldest Child, the only child who was verbal at the time, did not tell Mother about Father's abuse. As for the two younger children, there was testimony that, due to their age and mobility, they may not have exhibited any outward signs of injury or abuse, and even a trained physician could have misdiagnosed the fractures due to lack of manifestation. In fact, according to the child abuse pediatrician who examined Middle Child in September 2020, the children's physician misdiagnosed Middle Child's initial arm injury; and "it was only because [Mother] wanted a second opinion" that Middle Child received proper care. Mother also testified that, had she been aware of any abuse, she would have reported it to the police. And Mother testified as follows:

Q: Have you ever seen anybody injure [Middle Child]?

A: I have not.

Q: Have you ever seen anybody put their hands on [Middle Child]'s arms?

A: I have not.

Q: Have you ever seen anybody use an excessive amount of force on [Middle Child]?

A: I have not.

Q: Have you ever heard excessive force being used on [Middle Child]?

A: I have not.

12

Q: Have you ever heard force in general being used on [Middle Child]?

A: I have not.

Q: Have you ever seen any force being used on [Youngest Child]?

A: No.

Q: Have you ever heard of any force being used on [Youngest Child]?

A: I have not.

There also was evidence that Mother had taken steps to separate herself and the children from Father and to otherwise address deficiencies in her parenting. Mother testified that her relationship with Father had ended, that Father no longer had access to the children, and that, depending on resolution of the case, Mother intended to move in with the children and Great-Grandmother. And the children's foster care case manager testified that Mother was engaged in parenting services.

"A trial court is free to disbelieve any, all, or none of th[e] evidence," and "[t]he appellate court's role is not to re-evaluate testimony through its own perspective." *White v. Dir. of Revenue*, 321 S.W.3d 298, 308-09 (Mo. banc 2010). "The trial court receives deference on factual issues because it is in a better position not only to judge the credibility of the witnesses and the persons directly, but also their sincerity and character and other intangibles which may not be completely revealed by the record." *Id*. (quoting *Essex Contracting, Inc. v. Jefferson Cnty.*, 277 S.W.3d 647, 652 (Mo. banc 2009)). Here, it appears that the trial court found credible the testimony supporting denial of the petition.

The record contains substantial evidence that Mother did not commit "[a] severe act or recurrent acts of physical . . . abuse toward . . . any child in the family[, nor did the] circumstances . . . indicate that [Mother] knew or should have known that such acts were being committed toward . . . any child in the family." § 211.447.5(2)(c). Likewise, there was substantial evidence that Mother was not "unfit to be a party to the parent and child relationship because of a consistent pattern of committing a specific abuse . . . render[ing Mother] unable for the reasonably foreseeable future to care appropriately for the ongoing physical, mental, or emotional needs of the child[ren]." § 211.447.5(5)(a). Thus, the trial court's finding of no statutory grounds to terminate Mother's parental rights under §§ 211.447.5(2)(c) and 211.447.5(5)(a) is supported by substantial evidence.

Moreover, it is significant that J.O. bore the burden of proving the existence of a statutory ground for termination of Mother's parental rights.

> When the burden of proof is placed on a party for a claim that is *denied*, the trier of fact has the right to believe or disbelieve that party's uncontradicted or uncontroverted evidence. If the trier of fact does not believe the evidence of the party bearing the burden, it properly can find for the other party. Generally, the party not having the burden of proof on an issue need not offer any evidence concerning it. . . . Consequently, substantial evidence supporting a judgment against the party with the burden of proof is not required or necessary.

*Maly Com. Realty, Inc. v. Maher*, 582 S.W.3d 905, 911 (Mo. App. W.D. 2019) (quoting *In re K.M.W.*, 516 S.W.3d 375, 382 (Mo. App. S.D. 2017)).

Point I is denied.[10]

---

[10] Termination of parental rights requires a two-step analysis—the statutory-ground-for-termination step and the best-interest step. *In re B.K.B.*, 655 S.W.3d 16, 24 (Mo. App. W.D. 2022). Because we find the court's denial of J.O.'s petition under

14

## II. J.O. failed to show that denial of the termination petition was against the weight of the evidence.

In Point II, J.O. claims the court erred because denial of the petition was against the weight of the evidence. "'[W]eight of the evidence' denotes an appellate test of how much persuasive value evidence has, not just whether sufficient evidence exists that tends to prove a necessary fact." *Prime Healthcare Servs.-Kansas City, LLC v. Dep't of Health & Senior Servs.*, 653 S.W.3d 638, 645 (Mo. App. W.D. 2022) (quoting *Wilson v. Trusley*, 624 S.W.3d 385, 401 (Mo. App. W.D. 2021)). "A circuit court's judgment is against the weight of the evidence only if the circuit court could not have reasonably found, from the record at trial, the existence of a fact that is necessary to sustain the judgment." *Id.* (quoting *Wilson*, 624 S.W.3d at 402). And, "[b]ecause the circuit court is entitled to disbelieve the evidence of the party bearing the burden of proof, even if the opposing party presents no contrary evidence, 'relief based on a claim that the trial court's judgment against the party having the burden of proof is against the weight of the evidence is rarely granted.'" *Maly*, 582 S.W.3d at 911 (quoting *In re Killian*, 561 S.W.3d 411, 417 (Mo. App. S.D. 2018)).

---

§§ 211.447.5(2)(c) and 211.447.5(5)(a) was supported by substantial evidence, we need not address J.O.'s last point (Point V) challenging the trial court's finding that termination of Mother's rights was not in the children's best interest. *See In re M.A.*, 185 S.W.3d 256, 262 (Mo. App. W.D. 2006) ("The court . . . 'never reaches the issue of best interest . . . , unless and until a statutory ground for termination is proven.'" (quoting *In re K.C.M.*, 85 S.W.3d 682, 690 (Mo. App. W.D. 2002))); *In re S.J.H.*, 124 S.W.3d 63, 70 (Mo. App. W.D. 2004) (declining to address mother's point challenging the trial court's best-interest analysis where appellate court reversed judgment terminating parental rights on statutory grounds).

To succeed on her against-the-weight-of-the-evidence challenge, J.O. must engage in the following four-step analysis:

(1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;

(2) identify all the favorable evidence in the record supporting the existence of that proposition;

(3) identify the evidence in the record contrary to the belief of that proposition, resolving all conflicts in testimony in accordance with the trial court's credibility determinations, whether explicit or implicit; and

(4) demonstrate why the favorable evidence, along with the reasonable inferences drawn from that evidence, is so lacking in probative value, when considered in the context of the totality of the evidence, that it fails to induce belief in that proposition.

*Prime Healthcare Servs.*, 653 S.W.3d at 645 (quoting *Reichard v. Reichard*, 637 S.W.3d 559, 589 (Mo. App. W.D. 2021)). "As the challenger, [J.O.] bears the burden of showing that the trial court's finding is against the weight of the evidence." *Id.*

J.O. identifies the factual proposition that she challenges, which is the trial court's finding that grounds for termination did not exist. And J.O. identifies the evidence contrary to that finding, namely the extent and severity of the children's injuries, the fact that the abuse occurred repeatedly, Mother's role as the children's primary caregiver, and the absence of a credible explanation for the injuries.

But J.O. fails to acknowledge the evidence and inferences that support the trial court's finding. And J.O. "fails to demonstrate why the favorable evidence and inferences were so lacking in probative value, when considered in the context of the

16

entire record, as to fail to induce the finding that [grounds for termination did not exist]."

*Id.* at 646 (quoting *Reichard*, 637 S.W.3d at 589).

Because J.O. did not engage in the four-step analysis for an against-the-weight-of-the-evidence challenge, J.O. failed to carry her burden to show that the trial court's finding that grounds for termination did not exist was against the weight of the evidence. Point II is denied.

### III. J.O. failed to show that the trial court misapplied the law.

In Point III, J.O. argues the court erred because denial of the petition was based on misapplication of the law in that the court failed to make findings regarding the first amended motions to modify, misapplied § 211.447.5[11] and made inconsistent findings of fact and law, and misapplied § 211.477.4(3).[12]

---

[11] J.O.'s claim that the court misapplied § 211.447.5 simply rehashes the arguments she raises in Point I. Thus, we deny J.O.'s claim regarding misapplication of § 211.447.5 for the same reasons we deny Point I.

[12] Section 211.477.4(3) states,

4. If, after the dispositional hearing, the court finds that one or more of the grounds set out in section 211.447 exists, but that termination is not in the best interests of the child because the court finds that the child would benefit from the continued parent-child relationship or because the child is fourteen or more years of age and objects to the termination, the court may:

. . .

(3) Appoint a guardian under the provisions of chapter 475.

J.O. cites two concerns regarding the court's application of this section. First, J.O. asserts that the court did not clearly find a statutory ground for termination, which J.O. argues is a prerequisite to appointment of a guardian. Second, J.O. claims the court did not directly appoint a guardian, as permitted by statute, but instead directed the Children's Division to pursue appointment of Great-Grandmother as guardian. Both of these concerns relate to the form or the language of the judgment.

J.O.'s claims regarding resolution of the first amended motions to modify, inconsistent findings of fact and law, and failure to make the appropriate findings regarding appointment of a guardian all pertain to the form or language of the judgment. Rule 78.07(c)[13] directs that, "[i]n all cases, allegations of error relating to the form or language of the judgment, including the failure to make statutorily required findings, must be raised in a motion to amend the judgment in order to be preserved for appellate review."[14] "The purpose of Rule 78.07(c) is to ensure that complaints about the form and language of judgments are brought to the attention of the trial court where they can be easily corrected, alleviating needless appeals, reversals, and rehearings." *Southside Ventures, LLC v. La Crosse Lumber Co.*, 574 S.W.3d 771, 788 (Mo. App. W.D. 2019) (quoting *Dunlap v. State*, 452 S.W.3d 257, 263 (Mo. App. W.D. 2015)); *see also In re D.L.S. III*, 606 S.W.3d 217, 225 n.5 (Mo. App. W.D. 2020) ("Rule 78.07(c) requires a party to bring issues involving the form of a judgment (including the absence of required findings) to a trial court's attention as a condition of preserving a claim of error regarding those issues."); *In re K.S.*, 561 S.W.3d 399, 408 (Mo. App. W.D. 2018) (mother's claim that the trial court failed to make any findings regarding her emotional bond with her children was not preserved for appellate review because mother did not file a post-judgment Rule 78.07(c) motion).

---

[13] All rule references are to the Missouri Supreme Court Rules (2021).

[14] "Rule 78.07(c) applies to termination of parental rights cases." *In re J.A.R.*, 426 S.W.3d 624, 626 n.5 (Mo. banc 2014). *See also In re K.M.C., III*, 223 S.W.3d 916, 926-27 (Mo. App. S.D. 2007) (holding that a Rule 78.07(c) motion is required to preserve a claim of error based on alleged failure to make statutory best-interest findings required by § 211.447); *In re C.K.*, 221 S.W.3d 467, 469-70 (Mo. App. W.D. 2007) (same).

Here, J.O. did not file a motion to amend the November judgment, so the issues she raises now on appeal—resolution of the first amended motions to modify, inconsistent findings of fact and law, and failure to make the appropriate findings regarding appointment of a guardian—were not properly preserved for our review. J.O. argues that she was out of time to move to amend the November judgment, and doing so would have jeopardized compliance with the deadline to file an appeal. But, "'[u]nless an amended judgment shall otherwise specify, an amended judgment shall be deemed a new judgment for *all purposes*,' including the time from which a party can file an authorized post-trial motion from the amended judgment." *State ex rel. Mo. Parks Ass'n v. Mo. Dep't of Nat. Res.*, 316 S.W.3d 375, 381-82 (Mo. App. W.D. 2010) (quoting Rule 78.07(d) (emphasis added)). Here, the November judgment did not include language suggesting the trial court intended the September judgment to survive. *See id.* at 382 (finding initial judgment was rendered a nullity with the entry of the first amended judgment, and the first amended judgment was rendered a nullity with the entry of the second amended judgment); *see also Investors Title Co. v. Chicago Title Ins. Co.*, 18 S.W.3d 70, 74 (Mo. App. E.D. 2000) ("[T]he original judgment quite simply is not the trial court's judgment . . . the trial court's judgment is the amended judgment. . . .").

Because J.O. failed to file a motion to amend the November judgment, all arguments pertaining to the form and language of that judgment, including the alleged

failure to make required findings, are waived.[15] *Southside Ventures*, 574 S.W.3d at 788.

Point III is denied.[16]

## IV. J.O. failed to show that the trial court relied on inadmissible evidence or erroneously interpreted admissible evidence.

In Point IV, J.O. contends the court erred because, in denying the petition, the court relied on inadmissible evidence and erroneously interpreted admissible evidence.[17] In her brief, J.O. identifies the inadmissible evidence at issue as the assertion made by Father's counsel that Father took full responsibility for the children's injuries. To support her claim that the court relied on counsel's assertion, J.O. points to language in the November judgment wherein the court described "the *revelation* that [Father] was the perpetrator of the abuse." (Emphasis added.)

"Reversal on the basis of erroneous admission of evidence is rare in a non-jury case." *In re S.T.C.*, 165 S.W.3d 505, 512 (Mo. App. S.D. 2005). "In reviewing such cases, this court defers to the trial court's ability to consider the evidence that is relevant and admissible, and we presume that the trial court was not prejudiced or influenced by

---

[15] We also reject J.O.'s claim that the court misapplied § 211.477 because that section governs appointment of a guardian, and the court did not appoint a guardian here. Instead, the court directed J.O. *to investigate* appointment of Great-Grandmother as guardian for the children.

[16] Because J.O. did not preserve any challenge to the adequacy of the factual findings in the November judgment, Rule 73.01 directs that "[a]ll fact issues upon which no specific findings are made shall be considered as having been found in accordance with the result reached."

[17] As for J.O.'s argument that the court erroneously interpreted admissible evidence, Point IV simply rehashes the arguments J.O. made in Point I. Thus, we deny Point IV's claim regarding erroneous interpretation of admissible evidence for the same reasons we deny Point I.

inadmissible evidence." *Id.* As discussed in Point I, above, there was sufficient admissible evidence supporting the court's finding that Father was the likely perpetrator of the abuse. In view of that evidence, we cannot say that the court's use of the term "revelation" indicates that the court relied on inadmissible evidence to conclude that Father was the abuser. Point IV is denied.

## Conclusion

Because the trial court's denial of J.O.'s petition to terminate Mother's parental rights was supported by substantial evidence, was not against the weight of the evidence, and was not based on misapplication of the law, the court's judgment is affirmed.

_____
Karen King Mitchell, Judge

Alok Ahuja, Presiding Judge, and Edward R. Ardini, Jr., Judge, concur.